### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**COURTNEY SCAFIDI,**

> **Plaintiff,**

**v.**                                          **CASE NO.:  8:22-cv-2772-VMC-TGW**

**B. BRAUN MEDICAL INC.,**

> **Defendant.**

_____/

### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, COURTNEY SCAFIDI ("Scafidi"), by and through her undersigned counsel and pursuant to Rule 56, Federal Rules of Civil Procedure, moves for entry of an order granting partial summary judgment.

### INTRODUCTION

Plaintiff was employed by Defendant for over twenty years and was abruptly terminated because she refused to get a Covid-19 vaccine due to her sincerely held religious beliefs. Rather than costing Plaintiff her twenty-year career, Defendant could and should have first instead examined Plaintiff's specific job duties and the requirements of her customers.  Had Defendant done so, Defendant could have easily accommodated Plaintiff's religious beliefs without any undue hardship and she would have continued to be a successful employee for Defendant. Instead, Defendant failed to examine her specific job duties and, instead, callously terminated Plaintiff because of her religious beliefs. So, Plaintiff sued.

More specifically, Plaintiff has brought suit against Defendant for violations of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e et seq., and the Florida Civil Rights Act of 1992, as amended ("FCRA"), Fla. Stat. Section 760.01 et seq, alleging religious discrimination, failure to accommodate her religious beliefs, and retaliation for requesting a religious accommodation. (Dkt 1-3, pp. 1). In this motion, Plaintiff will show that she is entitled to summary judgment in her favor as to her counts for failing to accommodate her religious beliefs and for religious discrimination under Title VII and the FCRA.

## PLAINTIFF'S STATEMNET OF UNDISPUTED FACTS

1.      Plaintiff is a devout follower of the Christian religion. She believes her personal relationship with Christ comes foremost in her life. (Scafidi Depo., p. 38, lines 12-14).  She has been a Christian for as long as she can remember and regularly attends weekly worship services with her family. *Id.* at p. 38, lines 12-14; p. 38, lines 14-17. She was a member of Defendant's Christian Fellowship, a group of Christian employees who pray with and for one another. *Id.* at p. 27, line 8-13. In nearly every aspect of her life, Plaintiff has made her faith not just a priority, but the cornerstone upon which the rest of her life is built. Many of the people Plaintiff worked with were aware she was a person of faith. *Id.* at p. 26, lines 3-6.

2.      Defendant is a multibillion-dollar corporation that employs more than sixty thousand employees in more than sixty countries across the globe. (Vestal Depo, p. 8, lines 2-4.).

2

3.     Plaintiff was one of those employees. She began her employment with Defendant in August 1999 as an infusion therapy specialist. (Vestal Depo., p. 26, lines 8-12). For twenty-two years she worked for Defendant and, eventually, was promoted to the position of Senior Hospital Account Manager, which earned her a salary of in excess of two hundred thousand dollars per year. *Id.* at p. 39, lines 1-4.

4.     Her job performance matched her compensation level. For the last two years of her employment, Plaintiff received an overall rating of "Exceeds Expectations," a rating given to her by her direct supervisor, Andrea Malo. (Malo Depo., p. 54, lines 18-25; p. 55, lines 1-10). Not only, that, she received this rating during the years of the unprecedented Covid-19 pandemic. Ms. Malo described Plaintiff as "an excellent employee." (Malo Depo., p. 11, lines 7-16; Ex. 4 – 2020 Performance Review).

5.     As a Senior Hospital Account Manager, it was Plaintiff's job to service and make sales to healthcare facilities throughout the state of Florida. (Scafidi Depo., p. 64, lines 15-25; p. 65, lines 1-6).

6.     These facilities require credentials in order for salespersons to access them. There are six vendor credentialing service companies utilized by the facilities and Defendant to handle the credentialing process. (Lutseo Depo., p. 11, lines 25. p. 12, lines 1-9.) Defendant employs a Senior Sales and Operations Specialist named Kelly Lutseo whose role is to assist Defendant's employees with credentialing. *Id.* at p. 8, line 1-3. However, it is up to the individual employee to maintain their credentials. *Id*. at p. 4-13. Ms. Lutseo simply facilitated the

employees' credentialing questions, assisting them as needed; she did not actually do the credentialing. *Id*. at p. 26, lines 24-25; p 26, line 1-14.

7.     As vaccines to Covid-19 became available, Defendant set up a task force to determine what it's vaccine mandate policy would be and how it would handle requests for religious exemptions to a vaccine mandate. (Vestel Depo., p. 14, lines 21-25; p. 16, lines 8).

8.     On September 10, 2021, Defendant emailed Plaintiff and others stating, in part, "…we will now require most field-based and customer-facing colleagues across the region to complete the full course of COVID-19 vaccination. This includes sales, clinical educators (including temps), clinical nurse consultants, clinical applications specialists, service technicians, marketing product managers, and marketing project managers or other employees who are required to visit customers as part of their normal job responsibilities." (Vestal Depo., Ex. 8, Vaccine Mandate Email).

9.     Defendant attached FAQ's to the aforementioned email that stated, in part:

> Q.     What are the exemptions to opt out of getting a mandatory COVID-19 vaccine?
> A.     We will consider certain exemptions allowable by applicable law, including for disability, certain medical conditions or sincerely held religious beliefs. Please see below or contact benefits@bbraunusa.com for more information.
>
> Q.     Who may be eligible for an exemption from the Covid-19 vaccine mandate?
> A.     Certain colleagues may be eligible for a potential accommodation if they are disabled, have a qualifying medical

condition that contraindicates the vaccination, or if the object to being vaccinated on the basis of sincerely held religious belief. Please contact COVID_Exceptions@bbraunusa.com for more information.

Q.      What is the process to apply for an exemption?
A.      To initiate the process, please promptly contact COVID_Exceptions@bbraunusa.com to be considered for an accommodation.

Q.      What process is used to determine who receives an exemption?
A.      To ensure that the review is fair and consistent across the company, we have a process to review all accommodation request and evaluate each request on an individual basis to determine whether an accommodation falls into one of the narrow exemption categories. Once the request is received, we will engage in an interactive process to determine if a reasonable accommodation can be provided so long as it does not create an undue hardship for the company and/or does not pose a direct threat to the health or safety of others in the workplace and/or to the employee.

Q.      Do I need to be vaccinated if my customers do not require visitors to be vaccinated?
A.      Yes. In the interest of fairness, business continuity, and as part of our responsibility as a healthcare company we requiring all customer facing employees to be vaccinated.

Q.      Can I apply for another B. Braun role if I don't get vaccinated?
A.      Employes can apply for other non-customer facing opportunities in accordance with the job posting policy, keeping in mind the deadline of November 1, 2021.

*Id.*

10.      But this alleged "policy" was a farce.  Despite its statements indicating that it had a process to review all accommodations requests on an individual basis and that it would engage in an interactive process, Defendant decided it would ***not approve any religious accommodations prior to the implementation of its vaccine mandate policy***. Specifically, Juliet Vestal, Vice President of

Benefits and Human Resources for Defendant, who was placed in charge of denying requests for religious accommodations to Defendant's vaccine mandate, testified as follows:

> Q: So you knew September 10th you weren't going to grant any religious accommodations?
>
> A. Yes.

(Vestal, Depo., p. 31, lines 24-25; p. 32, line 1).

> Q: When did that task force decide that religious accommodation requests due to the Covid-19 10 vaccination requirement could not be met?
>
> A: So when the policy was issued, the decision had been made.

(Vestel Depo., p. 34, lines 8-13).

11.    Defendant's ultimate goal was to get one hundred percent of their salespeople vaccinated, because it perceived that as necessary to get their salespeople back in its customer's facilities to continue making the company what it really cared about—money.  (Vestal Depo, p. 107, lines 16-25.)

12.    Unaware that Defendant had predetermined that no religious accommodations were going to be granted under the Defendant's Covid-19 vaccine policy, approximately fifteen employees filled out religious exemption forms provided by Defendant and submitted a religious accommodation request to be exempt from Defendant's Covid-19 vaccine mandate policy. (Vestal Dep. p. 126: line 9-11; Vestal Depo., Ex. 54 - Religious Exemption Forms).

13.     Late in the day on Friday, September 24, 2021, Plaintiff submitted her vaccination accommodation request via email to Defendant based on her sincerely held religious beliefs. (Vestal Depo., Ex. 13 – Plaintiff's Request for Religious Accommodation). Defendant never challenged Plaintiff's religious beliefs, nor inquired about them at any time during Plaintiff's employment with Defendant. (Vestal Depo., p. 31, lines 14-19).

14.     On Tuesday, September 28, 2021 (less than two business days after Plaintiff made her request for religious accommodation), Ms. Vestal denied Plaintiff's request for religious accommodation claiming, "no accommodation available w/o imposing undue hardship for the Company." (Vestal Depo., p. 65, lines 22-25 and p. 66 lines 1-14; Vestal Ex. 11). That same day, Defendant prepared a denial form letter to send to Plaintiff. (Vestal Depo. Ex. 15- Denial Letter). The same letter was sent to all the other employees who requested a religious exemption to the Covid-19 mandatory vaccine policy. (Vestal Depo., p 58, lines 14-25; p. 59 lines 1-9; Ex. 26). This letter states, in part:

> You have asked to be permitted to work unvaccinated due to your religious beliefs and we have carefully considered your request. However, we are unable to approve you accommodation request because, among other reasons, there is no accommodation available that would enable you to conform with your stated religious beliefs and meet our job requirements without imposing undue hardship or risking the health and safety of fellow employees, customers, patients and/or members of the public. As such, we are unable to approve your request and expect that you will come into compliance with our vaccination requirement and submit your vaccination card by November 1, 2021.

(Vestal Depo., Ex. 15 – Defendant's Denial Letter to Plaintiff, p. 1 and 2)

15.     On October 4, 2021, Defendant sent its form denial letter to Plaintiff informing her of its decision to deny her request for religious accommodation. (Vestal Depo. p. 105, lines 9-19).

16.     At no point prior to the denial of her request for religious accommodation, or even before her termination, did Defendant have any discussion with Plaintiff regarding her request for accommodation or possible alternative accommodations. (Scafidi Depo., p. 110 lines 3-23; p. 165 lines 23-25; p. 166 lines 1-7; p. 253 lines 21-25; p. 254 lines 1-4).

17.     After Plaintiff's request for accommodation was denied, on or about September 29, 2021, Defendant created a Covid 19 Vaccine Accommodation Process chart it had no intention of following and did not follow with respect to Plaintiff. (Vestal Depo., Ex. 39 – Docs Produced by Defendant on 9-28-23, p. 5 and 6). Ms. Vestal testified about this process:

> Q: According to this flowchart here, after the third box which says employee submits required information, the box underneath that says, request is supported by adequate evidence of religious belief, medical condition, no or yes. You assumed that Ms. Scafidi and all the other customer-facing employees that were requesting religious accommodation checked off the box that said yes on that. Right?
>
> A: So they submitted their request. So I'm not sure when you're saying they checked off the box, yes. What are you referring to?
>
> Q: If you follow the flowchart, if it's answered no, you go one way, if it's answered yes, you go another way. I think you already testified on behalf of the company that for purposes of your denial, everybody was assumed to have a sincerely held religious belief so the answer would be yes?

A: So we didn't question it, but we could not accommodate it because of the undue hardship, so that's why we went and followed the route which was no, to provide the written decision to the employee.

Q: Okay. So you just determined it was an undue burden or undue hardship, so you just followed no and sent out the letter?

A: Correct. And also as you pointed out, this is dated September 29th. We issued the policy on September 10 where we had already made the decision.

(Vestal, Depo. p. 71, lines 22-25; p. 72, lines 1-25).

18. Curiously, on September 29, 2021, a day after Plaintiff's request for accommodation had already been denied, and also after that Company had predetermined that it was going to deny all requests for religious accommodations related to its Covid-19 vaccine policy, Ms. Vestal instructed a Human Business Partner named Kristen Miller to set a up meeting with the managers of several employees who requested a religious accommodation to allegedly discuss their job functions with their managers. (Vestal Depo., p. 79, lines 21-25; p. 80, lines 1-25, p. 81, lines 1-25; 82, lines 1-25; p. 83, lines 1-25; p. 84, lines 1-13; Ex. 53, pp. 1-3). These meetings, however, never took place, as on September 30, 2021, Ms. Vestal emailed Ms. Miller and told her, "You don't need to actually meet with the managers. We are assuming everyone needs to be vaccinated to do their jobs and you have discussed that with them. They are not at liberty to make any decisions or exceptions to the vaccination requirement. I can call you to discuss if you'd like." (Vestal Depo., Ex. 53, pp. 1-3).

19.     On November 2, 2021, Defendant terminated Plaintiff's employment. (Miller Depo., p. 58, lines 1-7).

20.     The process for credentialing continued in the same way it had before the pandemic. (Lutseo Depo., p. 11, lines 1-4). If a facility did have a vaccine mandate, Plaintiff could have requested an exemption through the vendor credentialing service. (Lutseo Depo, p 32, lines 6-19).

21.     Many of Defendant's customers' facilities maintained policies that allowed exemptions if a salesperson provided documentation that their employer had granted them a religious accommodation. For example, several of Plaintiff's facilities were run by BayCare. BayCare's November 15, 2021, policy was: "All Vendors/Contractors who come on site to any BayCare facility must be fully vaccinated or have an exemption through their employer. The Vendors/Contractors must provide proof of vaccination or exemption within 24 hours of receiving a request from BayCare." (Vestal Depo., Ex. 24 – Baycare Covid Policy, p. 6). This policy was implemented shortly after Plaintiff's termination. It is similar to many of the other facilities' policies. (Scafidi Depo., p. 86, lines 1-25; p. 87, lines 1-7). At the time of her termination, many of her facilities did not even have a Covid-19 vaccine policy. *Id.*

22.     Ms. Lutseo made Defendant's Human Resources department aware of the exemption policies of the various facilities. She also made them aware that any employee could have requested an exemption from their facilities. (Lutseo Depo., p. 40, lines 2-25; p. 13, lines 12-25; page 47, lines 1-10).

23.    At no point in between Plaintiff's request for a religious accommodation and her termination did anyone employed by Defendant reach out to Plaintiff or to Plaintiff's supervisor, Andrea Malo, to discuss Plaintiff's performance or her ability to do her job without the Covid-19 vaccine. (Malo, Dep. p. 28, lines 18-2; p. 29, lines 1-12.)

24.    Defendant never asked Ms. Malo if Plaintiff had been denied by any vendor credentialing services. In her deposition, Ms. Malo testified:

> Q: Did anyone in HR or management ask whether or not Ms. Scafidi was denied or granted any exemptions from any vendor credentialing services prior to her termination?

> A: No.

(Malo, Dep., p. 42, lines 23-25, p. 43, lines 1-2).

25.    Ms. Lutseo was unaware whether or not Plaintiff's exemption requests had been approved or denied by any of her facilities prior to her termination. (Lutseo, p. 51, lines 2-6). Similarly, the Company was not aware of any facilities that Plaintiff was denied access to as result of not receiving the Covid-19 vaccine because it did not bother to check with Plaintiff or her manager. (Vestal Depo., p. 48, lines 1-22).

26.    Defendant claims it allowed Plaintiff and others who were denied religious accommodations to its Covid-19 vaccine policy to apply for a non-customer facing role where a Covid-19 vaccination was not required. (Vestal Depo., p. 36, lines 18-25; p. 37, lines 1-13). Besides a single mention in the FAQ's, Defendant never instructed Plaintiff to apply for a non-customer facing role or

discussed any vacancies with her. (Vestal Depo., p. 40, lines 18-21).  During the Corporate Representative, Defendant testified that claimed that there were numerous positions that Plaintiff could have applied for. (Vestal Depo., p 38, lines 2-21, Ex. 55 – Job Openings). However, none of these positions were located in the Tampa Bay area, where Plaintiff resides with her family, and the closest available positions were in Daytona Beach, Florida. *Id.* Furthermore, Defendant did not know if these positions would have paid Plaintiff a comparable salary as her sales position. (Vestal Depo., p. 38, lines 22-25.)  Additionally, there was no guarantee that Plaintiff's skills, education, and experience would be relevant to any of these positions. (Vestal Depo., p. 40, lines 1-16).

27.     It is the Defendant's position that Plaintiff's performance had nothing to do with her termination. (Vestal Depo. p 134, lines 1-5).

28.     At the time of her termination, Plaintiff worked mostly from home and was not required to physically go into her facilities. Most of her facilities were not accepting salespeople and there was no need for her to go into them. (Malo Depo, p. 74, lines 11-25; p. 75 1-25; p. 76, lines 1-18.)

29.     After Plaintiff's termination, Defendant implemented an interactive process for responding to requests for reasonable religious accommodations where it actually met with individuals and discussed the employees' job functions,

something Defendant never did with Plaintiff. (Vestal Depo., Ex. 38 – Video Interview by Juliet Vestal).[1]

### MEMORANDUM OF LAW

**I.     Plaintiff Is Entitled To Summary Judgment in Her Favor on Her Claims of Disparate Treatment and Failure to Accommodate Related to Her Religious Beliefs**

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. An issue is material "if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods*, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

Title VII bans religious discrimination in employment: "It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,

---

[1] During this meeting, Ms. Vestal referred to the Bible a "two-thousand-year-old book." (*Id.*; Vestal Depo., p. 75, line 18-23, Ex. 38).

because of such individual's . . . religion . . . ." 42 U.S.C. § 2000e-2(a). The statute defines "religion" broadly to include "all aspects of religious observance and practice, as well as belief." Id. § 2000e(j). Claims brought under the Florida Civil Right Act ("FCRA") are analyzed under the same framework and standards at Title VII claims. *Murdick v. Catalina Mktg. Corp.*, 496 F. Supp. 2d 1337 (M.D. Fla. 2007)

Title VII and the FCRA also require employers to accommodate the religious practice of their employees. See 42 U.S.C. 2000e-2(a). Such accommodations often go beyond the non-religious accommodations they might otherwise provide. See *EEOC v. Abercrombie & Fitch*, 575 U.S. 768, 775 (2015)("Title VII does not demand mere neutrality with regard to religious practices. . . .Rather, it gives them favored treatment . . . ."). In summary, Title VII and the FCRA requires that employers have both a negative duty not to discriminate and a positive duty to accommodate an employee's religious beliefs. See *Hebrew v. Texas Department of Criminal Justice*, Case No. 22-20517 (5th Cir. September 15, 2023)(reversing summary judgment in favor of employer where the court decided as a matter of law that defendant failed to meet its burden of establishing an undue burden for denying a religious accommodation and that it discriminated against plaintiff based on his religious beliefs or practices). Here, the Court must find that Defendant failed to accommodate Scafidi's religious beliefs and that it discriminated against her on the basis of her religious beliefs.

### A. Plaintiff's Failure to Accommodate Claim

Plaintiff will first examine her denial of religious accommodation claims under Title VII and the FCRA. The statutes in question require an employer to accommodate "all aspects of religious observance and practice" unless the employer demonstrates that it cannot accommodate the employee's religious observance or practices "without undue hardship on the conduct of the employer's business." 42 U.S.C. 2000e(j).

It is undisputed that Plaintiff requested a religious accommodation in the form of being exempt from Defendant's mandatory Covid-19 vaccine policy. It is also undisputed that Defendant did not challenge the sincerity of Plaintiff's religious beliefs that formed the basis for her request for an exemption at any time during Plaintiff's employment. (*See* Ex. A - Defendant's Objections and Responses to Plaintiff's First Request for Admissions, # 2). Moreover, it is undisputed that Defendant denied Plaintiff's request for a religious accommodation or exemption from its mandatory Covid-19 vaccine requirement two business days after Plaintiff requested such accommodation without even speaking to Plaintiff and/or her manager regarding her specific job duties or the actual requirements of the customers she serviced. The only question to be determined by the Court as to Plaintiff's claims for denial of accommodation is whether Defendant has met its burden to show that granting Plaintiff's requested accommodation would place an undue hardship on Defendant. For the reasons explained below, Plaintiff maintains

that Defendant cannot meet the undue hardship standard, and Defendant's arguments for attempting to meet its burden are without merit.

The Supreme Court recently clarified the undue hardship standard. *Groff v. DeJoy*, 600 U.S. 447, 143 S. Ct. 2279, 216 L. Ed. 2d 1041 (2023). Many courts had read a prior Supreme Court decision, *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977), to hold an "undue hardship" was "any effort or cost that is "more than ...de minimis." *Groff*, 143 S.Ct at 2286 (quoting *Hardison*, 432 U.S. at 84). In *Groff*, a unanimous Court rejected such a reading. The Supreme Court held that a showing of undue hardship requires something far greater; an employer must prove that the burden of accommodation "is substantial in the overall context of employer's business." *Id*. At 2294. The Supreme Court looked to various definitions of hardship and found:

> Under any definition, a hardship is more severe than a mere burden. So even if Title VII said only that an employer need not be made to suffer a "hardship," an employer could not escape liability simply by showing that an accommodation would impose some sort of additional costs. Those costs would have to rise to the level of hardship, and adding the modifier "undue" means that the requisite burden, privation, or adversity must rise to an "excessive" or "unjustifiable" level." *Id.*

This is heavy burden and requires something far greater than de minimis-something more akin to "substantial additional costs or substantial expenditures." *Id*. at 2295.

The Court went on to say:

> "We think it is enough to say that an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business.

16

What matters more than a favored synonym for "undue hardship" (which is the actual text) is that courts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer." *Id* at 2295.

The Supreme Courts reference to "all relevant factors in the case at hand" requires this Court to tailor its analysis to each individual case. See *Hebrew*, 80 F.4th at 723, footnote 1. (citing *Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1881 (2021)("Rather than rely on broadly formulated interests, courts must scrutinize the asserted harm of granting specific exemptions to particular religious claimants."). Furthermore, the Supreme Court's reference to the size and operating costs of the employer "suggests that, all other things being equal, larger businesses and institutions must bear a heavier burden in proving undue hardship." Id.

In its decision, the Supreme Court also noted what is not an undue hardship. Because the hardship must affect "the conduct of the employer's business," evidence of "impacts on coworkers is off the table for consideration" unless such impacts place a substantial strain on the employer's business. *Groff*, 143 S.Ct at 2296. Even if an impact on coworkers places a substantial strain on the employer's business, that impact "cannot be considered undue" if it is attributable to religious bias or animosity." *Id*.

Lastly, the Court stated that "Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations." *Id*. If

the requested accommodation poses an undue hardship, the employer must sua sponte consider other possible accommodations. Id at 2297. Only after thorough consideration of other options may the employer deny the employee's request for accommodation. Cf. *Adeyeye v. Heartland Sweeteners*, LLC, 721 F.3d 444, 455 (7th Cir. 2013) ("On this issue, [the employer] bears the burden of proof, so it must show, as a matter of law, that any and all accommodations would have imposed an undue hardship.") (cited in *Groff*, 143 S. Ct. at 2296).

Here, Defendant cannot meet its heavy burden to establish an undue hardship. As noted earlier, Defendant fails to identify any actual costs it would have faced had it granted Plaintiff's request for accommodation. Indeed, in its form denial letter, which it sent to Plaintiff and all other persons who requested a religious accommodation from its mandatory Covid-19 vaccine policy, Defendant generally claims undue hardship and safety concerns if it were to grant a religious accommodation without any independent factual basis or support for such claims. If Defendant had simply taken the time and effort to speak with Plaintiff and/or her manager re her job duties and credentialing, rather than simply jumping to false assumptions re job duties and her ability to meet with customers and making the decision that it was going to deny all requests for religious accommodations before it rolled out its mandatory Covid-19 vaccine policy, it would have learned that Plaintiff could have continued to do her job despite not getting the Covid-19 vaccine as Defendant's customers either did not require her to appear in person or would have allowed her to visit their facilities if she had been granted a religious exemption

18

to the Covid-19 vaccine by Defendant. In summary, Defendant rejected Plaintiff's accommodation request without a thorough examination of Plaintiff's individual situation and circumstances. Accordingly, Defendant cannot meet its heavy burden to establish an undue hardship and Plaintiff must prevail on her denial of accommodation count. *Hebrew*, 80 F,4th at 723 ("It simply rejected Hebrew's accommodation request without a thorough examination of any and all alternatives.").

Plaintiff anticipates that Defendant will attempt to raise several counterarguments as to why it could not accommodate Plaintiff's request for a religious exemption to its mandatory Covid-19 Vaccine policy without causing it an undue hardship. All of Defendant's anticipated arguments to support its asserted undue hardship should be rejected by the Court. First, Defendant will most likely assert that if it had to ask Plaintiff what facilities encompass her territory and what her customer policies were concerning Covid-19 vaccines and exemptions thereto, it would have had to incur some unspecified significant cost. This argument should be rejected out of hand by the Court. Defendant is multi-billion-dollar company with over 60,000 employees in 60 plus countries across the globe. Defendant cannot meet its burden by simply stating that would be an undue hardship without identifying specific costs and allowing the Court to analysis such costs vis a vis the size of Defendant and its resources. Moreover, Defendant already had mechanisms in place for tracking vendor credentialing prior to its Covid-19 vaccine mandate. Individual sales employees, such as Scafidi, were required to maintain his or her

own credentials using the vendor credentialing system. Indeed, Plaintiff was not denied any credentials as a result of not getting the Covid-19 vaccine.

Most importantly, fewer than twenty employees applied for a religious exemption. Given Defendant's vast resources, it could have simply met with Plaintiff and the others and/or their managers and determined whether they had been denied access to any facilities or if the facilities allowed for religious exemptions. The facilities' vaccine policies were not changing on a day-to-day basis. The Baycare policy cited above is a good example of this. Many of the facilities did not implement vaccine policies until after Plaintiff's termination.   Although Plaintiff was responsible for over 100 facilities, these facilities were all grouped together by hospital system. The hospital systems implemented cross facility vaccine policies if they had policies at all. Plaintiff dealt with less than 10 hospital systems in total. If Defendant had bothered to ask Plaintiff or her supervisor, it could have easily ascertained the vaccine mandate policies for the hospital systems. They would have learned that the hospital systems either didn't have policies in effect at the time of Plaintiff's termination or that, if they did, they provided accommodations for religious exemptions, like Baycare's policy.

Second, Defendant may argue a whole new system would have to be set up to track the exemptions at the various facilities. This is simply not true. Once again, the vendor credentialing systems already in use by Defendant at the time of Plaintiff's accommodation request allowed for salespersons to independently apply for a religious exemption to any Covid-19 mandatory vaccine requirement instituted at

the customer's facilities if they had policies at all. If Defendant had granted Plaintiff's accommodation request, there is no evidence that she would not have been able to visit her customers. Regardless, at the time of her termination, Plaintiff was not required to visit any facilities anyway.

Third, Defendant will most likely assert that it could not accommodate Plaintiff due to safety concerns. This argument must also fail. As Ms. Vestal testified, Defendant left the safety analysis up to its customers. In other words, Defendant did not make an independent analysis related to safety nor the costs associated with Plaintiff not getting the Covid-19 vaccine or using alternatives such as masking, distancing, or testing, or working remotely. *Hebrew,* 80 F. 4th at 724. ("Even if such safety concerns did exist. TDCJ would still bear the burden of demonstrating the 'substantial increased costs' needed to address such concerns.") As mentioned above, Plaintiff's customers did not require her to visit her facilities before her termination and she was not denied access or credentials to any facilities in her territory[2] at any point before her termination. Therefore, the customers, whom Defendant relied to determine safety of its patients, did not have a problem with Plaintiff being granted a religious exemption and/or performing her job as she had done so successfully prior to her unlawful termination. Accordingly, this argument fails to support any undue hardship as required by Title VII and the FCRA.

---

[2] It is notable that Plaintiff's territory was limited to Florida. During the Covid-19 pandemic, the government's reaction to Covid-19 and accessibility varied drastically from state to state. Nonetheless, Defendant failed to conduct any analysis of costs associated with each state it did business in or specifically explore Plaintiff's Florida based customers ad their Covid-19 vaccine policies.

Fourth, Defendant may argue it offered Plaintiff a reasonable accommodation by saying she could apply for another non-customer facing job with Defendant. This argument too is without merit. Plaintiff was never offered any comparable jobs. She was simply told she could apply for any vacant non-customer facing job. There is no evidence that any such jobs were comparable to the one she was terminated from or were located in the Tampa Bay area, where Plaintiff resides with her family. Indeed, Ms. Vestal testified, on behalf of the Defendant, that she did not know of any vacancies at the time where Plaintiff resided or if the jobs paid the same as Plaintiff's sales job. (Vestal Depo., p 38, lines 2-21). Moreover, Ms. Vestal did not know if Plaintiff would have been qualified for any of the vacant non-customer facing positions. (Vestal Depo., p. 40, lines 1-16). Most importantly, nobody discussed any vacant comparable positions with Plaintiff. (Vestal Depo., p. 116, line 4-10). Instead, Plaintiff inquired on her own and found out that there was no comparable positions for which she was qualified for to apply for. (Scafidi Depo., p. 103, line 2-17). Accordingly, the offer to apply for a vacant position was not a reasonable alternative accommodation for Plaintiff.

Fifth, Defendant may argue that it would have to reconfigure its sales territories and the corresponding quotas if it had granted Plaintiff's exemption request. (Vestal Depo, p. 118, lines 24-25; p.119, lines 1-18). This is based on the false assumption that Plaintiff would not have been able to get into her facilities. There is no evidence this was the case, as noted above. Defendant did not even look at what Plaintiffs facilities were and were not requiring. (Vestal Depo., p 121, lines 3-4).

Additionally, at the time of her termination, Plaintiff was not required to visit these facilities. Some of these facilities did not allow salespeople to visit at all.

Ultimately, before it even rolled out its mandatory Covid-19 vaccine policy, Defendant decided it was going to deny all religious accommodation requests. There are three realities when it comes to Defendant's supposed undue hardship: it did not know what it would be; it did not try to understand what it would be; and it did not care what it would be. Defendant decided if you were religious and asked for a religious exemption to its vaccine mandate, your employment would be terminated. Plaintiff is religious, she asked for an accommodation because of her religious beliefs, and Defendant denied her accommodation request and terminated her employment. In doing so, Defendant failed to accommodate her reasonable religious request and violated Title VII and the FCRA.

## B. Plaintiff's Religious Discrimination Claim

As the Supreme Court has held, "the rule for disparate-treatment claims based on a failure to accommodate a religious practice is straightforward: An employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions." *Abercrombie*, 575 U.S. at 773. That means an "employer violates Title VII" if the employee "requires an accommodation of [a] religious practice, and the employer's desire to avoid the prospective accommodation is a motivating factor in his decision" to terminate the employee. Id. at 773–74. Notably, this "motivating factor" standard is "broader than the typical but-for causation standard" and encompasses many claims of religious

discrimination. *Nobach v. Woodland Vill. Nursing Ctr., Inc.*, 799 F.3d 374, 378 (5th Cir. 2015). An employer need not even know about the employee's religious practice; it violates Title VII and the FCRA so long as it takes the action "with the motive of avoiding the need for accommodating a religious practice." *Abercrombie*, 575 U.S. at 774 (emphasis in original). And motive is especially easy to infer where an employee has submitted a request for accommodation or where the employer knows of the employee's religious practice. See *Id.*; *Nobach*, 799 F.3d at 378.

Plaintiff's religious practice was more than a motivating factor in Defendant's termination. In fact, it was the only factor that led to her discharge. Defendant decided that it would not a accept any religious accommodation requests in response to its Covid-19 vaccine mandate. More importantly, Defendant decided it would reject religious accommodation requests and terminate employees who requested them. Defendant admitted it did not terminate Plaintiff's employment because of her performance. Defendant's desire to avoid the prospective accommodation was a motivating factor in its decision to terminate Plaintiff. Plaintiff has sufficiently proved that Defendant fired her "because of" her religious belief. 42 U.S.C. § 2000e-2(a); see also id. § 2000e(j); *Abercrombie*, 575 U.S. at 773; *Nobach*, 799 F.3d at 379.

Finally, Defendant may argue no Title VII or FCRA violation occurred in this case as to the Plaintiff because its proffered reason for discriminating against Plaintiff was neutral and based on legitimate safety concerns. The employer in

24

*Abercrombie* made the same argument, contending "that a neutral policy cannot constitute 'intentional discrimination.'" 575 U.S. at 775. But the Supreme Court rebuffed this argument, holding:

> Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not to fail or refuse to hire or discharge any individual . . . because of such individual's religious observance and practice. An employer is surely  entitled to have, for example, a no-headwear policy as an ordinary matter. But when an applicant requires an accommodation as an aspect of religious . . . practice, it is no response that the subsequent failure . . . to hire was due to an otherwise-neutral policy. Title VII requires otherwise-neutral policies to give way to the need for an accommodation.

*Id.* (quotations omitted).

Likewise, in this case, Defendant cannot hide behind an "otherwise-neutral policy." *Id.* This policy must "give way" to Plaintiff's requested accommodation. *Id.* Plain and simple, "religious practice is one of the protected characteristics that cannot be accorded disparate treatment and must be accommodated." *Id*; *Hebrew*, F.4th 725 (finding religious discrimination for Defendant's failure to accommodate an employee's religious beliefs).

**WHEREFORE**, Plaintiff moves this Honorable Court for entry of summary judgment against Defendant as to liability as to her claims under Title VII and the FCRA for denial of accommodation and religious discrimination.

Dated this 17th day of October, 2023.

Respectfully submitted,

**LUIS A. CABASSA**
Florida Bar Number: 0053643
Direct No.: 813-337-379-2565
**SAWYER N. FRESCOLN**
Florida Bar Number: 1034987
Direct No.: 813-337-7993
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Main No.: 813-224-0431
Facsimile: 813-229-8712
Email: lcabassa@wfclaw.com
Email: sfescoln@wfclaw.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 17th day of October, 2023, the foregoing was electronically filed with the Clerk of Court via the CM/ECF system. I further certify that a true and correct copy of the foregoing document will be served with the Complaint.

**LUIS A. CABASSA**

26