UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

COURTNEY SCAFIDI,

    Plaintiff,

v.                          Case No. 8:22-cv-2772-VMC-TGW

B. BRAUN MEDICAL, INC.,

    Defendant.

_____/

## ORDER

    This matter comes before the Court pursuant to Plaintiff Courtney Scafidi's Motion for Partial Summary Judgment (Doc. # 54) and Defendant B. Braun Medical, Inc.'s Motion for Summary Judgment (Doc. # 60), both filed on October 17, 2023, in this Title VII and Florida Civil Rights Act (FCRA) religious discrimination and retaliation case. Both parties have responded (Doc. ## 69, 70) and replied. (Doc. ## 74, 75). For the reasons that follow, Braun's Motion is granted in part and denied in part, and Scafidi's Motion is denied.

**I.   Background**

    **A. Braun's Business and Vaccine Policy**

    Braun is "a full line supplier of IV therapy products, including IV solutions, drug delivery systems, vascular access devices [], and infusion pumps," which Braun markets

1

and sells to hospitals and medical providers throughout the country. (Grispo Decl. ¶ 3). Scafidi worked as a Senior Hospital Account Manager for Braun in Florida. (Scafidi Depo. at 63:10-64:12 & Ex. 6). This was a sales position, and Scafidi's job duties included making in-person, on-site sales of IV systems to clinical staff and hospital management at facilities within her territory and ensuring her customers were trained on these systems. (Id. at 63:10-66:25). Prior to the COVID-19 pandemic, Scafidi spent most of her "time 'on site' at hospitals within [her] territor[y]." (Grispo Decl. ¶ 5). There were just over 100 hospitals in Scafidi's territory. (Id.).

When the COVID-19 pandemic began in 2020, most hospitals barred sales representatives from entering hospitals. (Id. at ¶ 6). This had a large impact on Braun's sales operations. (Scafidi Depo. at 66:22-67:23; Lutseo Depo. at 21:12-23; Malo Depo. at 74:22-76:1). Prior to the vaccine, hospitals slowly began allowing vendor representatives to reenter healthcare facilities, but only when essential and under strict conditions, i.e., masking requirements and distancing. (Grispo Decl. at ¶ 7). Braun restarted some new sales operations but was unable to resume its full array of pre-pandemic work, including the work performed by Scafidi. (Malo

Depo. at 80:9-22). The goal was always to resume normal operations to continue to thrive as a company. (Id.). During the pandemic and before her termination in November 2021, Scafidi was mostly working from home and rarely going into hospitals. (Malo Depo. at 74:11-76:18).

COVID-19 vaccines became available in early 2021. During this time, Braun constantly monitored the pandemic and its fluid effect on both its workforce and its customers. (Malo Depo. at 32:4-15; Grispo Decl. at ¶ 8). As the vaccine rollout became more widespread, some of Braun's customers and vendor credentialing services informed Braun that certain hospitals would soon require vendor employees (like Scafidi) to be fully vaccinated before entering patient facilities. (Lutseo Depo. at 24:21-27:23; Grispo Decl. at ¶ 9).

Scafidi disputes that all hospital systems within her territory had or were planning to implement vaccine requirements for visiting salespeople. (Lutseo Depo. at 32:6-19; Scafidi Depo. at 85:17-86:15). She also highlights that many of the hospital systems in her territory allowed for religious exemptions to the vaccine with Scafidi able to submit exemption requests through each hospital system's vendor credentialing system. (Scafidi Depo. at 85:17-86:15, 87:7-8). While most hospitals, through credentialing

services, offered forms to allow vendor employees to request exemptions, they offered no guarantee that any healthcare facility would accept or accommodate any exemption to allow a vendor representative to perform the essential customer-facing functions of his or her job. (Lutseo Depo. at 22:9-23:2; 40:9-25).

Braun issued its own vaccination policy for customer-facing employees working in patient-care settings on September 21, 2021. (Donigan Depo. at 14:22-15:3 & Ex. E). The policy provides in relevant part:

> As such, we will now require most field-based and customer-facing colleagues across the region to complete the full course of COVID-19 vaccination. This includes sales, clinical educators (including temps), clinical nurse consultants, clinical applications specialists, service technicians, marketing product managers, and marketing project managers or other employees who are required to visit customers as part of their normal job responsibilities. If you have received this email, you are required to be fully vaccinated against COVID-19 as part of your job responsibilities by Monday, November 1, 2021.

(Id.). Attached to the email with this policy was a FAQ page. (Id.). The FAQ informed employees that they could apply for an exemption from the policy. (Id.). It also informed employees, under the question "Can I apply for another B. Braun role if I don't get vaccinated?," that "[e]mployees can apply for other non-customer-facing opportunities in

4

accordance with the job posting policy, keeping in mind the deadline of November 1, 2021." (Id.).

According to Joe Grispo, Braun's Senior Vice President of Sales and Chief Sales Officer, "[t]he decision to limit the scope of the mandatory policy to employees in patient-care settings was an attempt by [] Braun to balance on the front-end many competing interests, including the need as a healthcare company to trust healthcare science; to keep the health and safety of vulnerable patient populations top-of-mind; to respect the health, safety, and rights of its employees; and to maintain its competitiveness in the marketplace by ensuring its salesforce was resuming pre-COVID operations as would be its competitors." (Grispo Decl. at ¶ 11). Grispo avers that "Braun further determined that an undue burden would occur even if an appreciable number of customers within a given territory would allow employee access without vaccinations." (Id. at ¶ 12). "This was because if even one of an unvaccinated sales representative's customers or prospective customers declined to honor a religious exemption request or decided not to allow for full facility access, it would create an intractable coverage problem, as well as an imbalance within the territories and the revenue associated with the territories for the sales representative and all of

the counterparts with the same title." (Id.); see also (Malo Depo. at 84:4-85:8).

According to Grispo, "[e]xtrapolated over the scores of hospitals within a given territory, the resulting patchwork quilt of one-off exemptions would be both impossible to track and impossible to account for under [] Braun's territorial compensation system." (Grispo Decl. at ¶ 13). Thus, "Braun would need to recalculate the sales dollars, not only from a geography standpoint, but also from a compensation standpoint to assure that, all employees were treated equally and that base salaries equated to the role's responsibilities." (Id.). "Moreover, the fluid and dynamic nature of the vaccine requirements that were rolling out at the time meant that [Braun] would have to constantly revamp the territories to ensure customer coverage and equitable compensation." (Id.).

Scafidi's supervisor, Andrea Malo, testified that reconfigurations of territories to adjust to vaccination exemptions would have required involvement from compensation analysts, to build quotas with the Vice President of Sales, human resources, the Chief Financial Officer, and ultimately the CEO. (Malo Depo. at 85:9-86:22). When Braun had reconfigured territories in the past, that restructuring process had taken "at least 18 months." (Id. at 87:15-88:6).

For her part, Scafidi notes that her exemption denial letter did not mention any administrative difficulties or costs as the reason for the denial. (Doc. # 70-10). Braun's corporate representative and Vice President of benefits and human resources administration, Juliet Vestal, testified that Braun did not do any analysis to determine the costs of reconfiguring Scafidi's territory if any hospitals denied her admission. (Vestal Depo. at 126:23-127:2). Vestal also testified that Braun was not aware of any hospital system that had denied Scafidi access because of her unvaccinated status. (Id. at 48:1-22). Braun's employee in charge of helping salespeople manage vendor credentialing, Kelly Lutseo, was unaware of whether any of Scafidi's exemption requests made to various hospital systems had been denied. (Lutseo Depo. at 51:2-7).

**B. Scafidi's Exemption Request and Termination**

Scafidi applied for a religious exemption from Braun on September 24, 2021. (Scafidi Depo. at 125:5-129:7 & Ex. 12). Scafidi's desired accommodation was to continue performing her current job without the requirement to get vaccinated. (Id. at 105:3-22, 150:1-8).

Scafidi is a "Bible-believing Christian" who attends Plant City Church of God. (Id. at 26:4-5, 36:12-15). She does

not have a religious objection to vaccines in general, and her church took no stance on the COVID vaccine. (Id. at 32:24-33:14, 40:24-41:8). Concern over the use of aborted fetal cells in the vaccine was not the reason for her refusal to get the vaccine. (Id. at 50:10-17).

Scafidi did have concerns over the efficacy and safety of the COVID vaccine. (Id. at 23:17-25:25, 44:14-46:13, 50:18-51:5, 132:4-15, 155:10-16). She noted that there was lots of information and "misinformation" during the pandemic about the vaccine. (Id. at 23:20-23). Scafidi highlighted a Harvard study that "looked at the pockets of those that were vaccinated and those that were getting COVID, and they didn't see a reduction in COVID based on folks that were getting the vaccine." (Id. at 24:16-25). She also believed that she had "natural immunity" because she had COVID in August 2021. (Id. at 43:4-9).

Ultimately, Scafidi testified that the reason she refused to get the COVID vaccine was "a matter of conscience":

Q: What is it about your religion that prevents you from receiving the vaccine?

A: Just going back to a matter of conscience, there was so much flooding me at the time.

Q: What do you mean by so much flooding you?

8

A: So many mixed messages that were being sent, and they seemed to change weekly, monthly --

Q: What kind of mixed messages? I'm sorry to interrupt.

A: There were all kinds of things -- well, again, we're going back to the past year, we have had the Harvard study that came out. My own daughter that I mentioned to you, she's had all sorts of treatments and medical interventions and the like, and I remember being very concerned for her wellbeing from COVID and not knowing how she would react because she has a deficient lung.

(Id. at 41:25-42:16). Scafidi connected her conscience to the

Holy Spirit:

Q: Okay. What is it about your religious beliefs that prevent you from taking the COVID vaccine?

A: I think I kind of explained it before. How -- I abided by the basic rule of thumb and principal that's guided me my entire li[f]e. I have to stick by my conscience. If my conscience is telling me otherwise, I know that God knows what is best for me, and the Holy Spirit will direct me. That's been through every decision I have ever made my entire life.

. . .

Q: . . . Do your beliefs about sticking by your conscience, do they come from any specific parts of the Bible or religious doctrine that you're following?

A: Oh, sure. It's laced throughout all the New Testament. As I mentioned, the Old Testament wasn't really a matter of conscience; it was a matter of sacrifices and more of laws and rules, and then it switched over after the death and resurrection of Jesus.

(Id. at 48:13-49:9).

Scafidi's exemption request was denied on September 28, 2021. (Id. at Ex. 13). After her exemption was denied, Scafidi made various appeals to Braun supervisors or executives, asking that she be allowed to keep her customer-facing job without getting vaccinated. (Scafidi Depo. at 134:6-142:21, 145:20-176:5, Ex. 15-20).

For example, Scafidi spoke to Grispo, Malo, and Jason Cronan, Braun's Vice President of Hospital Care Sales. Scafidi both called and sent text messages, along with links to articles about the vaccine's safety and efficacy, to Cronan to garner support for her exemption request. (Cronan Decl. at ¶ 4 & Exs. A-B). According to Cronan, "Scafidi's objections did not appear to [him] to be religious in nature. Instead, her focus was on the safety, efficacy, and alleged experimental nature of the vaccines." (Id. at ¶¶ 4-5). Grispo averred that during his conversation with Scafidi she "explained her objections to the vaccine related mostly to concerns over their safety" and "did not point to any religious doctrine or other religious underpinning that she believed required her to refuse the vaccine." (Grispo Decl. ¶ 15). Malo testified that the written materials Scafidi gave her in attempting to explain why she did not want the COVID

vaccine were not religious in nature; rather, they were "[m]ore political, even at times more QAnon." (Malo Depo. at 83:18-84:3).

Although Scafidi knew she could apply for non-customer-facing jobs with Braun if she chose not to vaccinate, Scafidi never applied for another position with Braun. (Scafidi Depo. at 101:17-102:17, 103:18-24). She testified that the available non-customer-facing positions "would have been less money or relocated." (Id. at 103:13-21). According to Grispo, Scafidi told him that "she was not interested in other positions within the company mainly because they would require her to relocate, and she did not want to leave Florida." (Grispo Decl. ¶ 14). Vestal testified that no positions were available in Tampa, and she was not aware if any of the open positions paid a salary close to what Scafidi had been earning in her sales position with Braun. (Vestal Depo. at 38:2-25). The closest available non-customer-facing positions were in Daytona Beach, Florida. (Id. at 38:5-12). Vestal was also unaware if Scafidi was qualified for any of the available positions. (Id. at 40:5-17).

Instead of applying for an available non-customer-facing position, Scafidi asked that a new position be created for her with a Braun "team that handles national accounts," but

"they didn't have it within budget to create an extra role for her." (Scafidi Depo. at 103:22-104:6).

Because Scafidi did not get vaccinated by the deadline, her employment was terminated on November 1, 2021. (Id. at Ex. 22). At the next job Scafidi obtained with a different employer, she submitted a request for religious exemption to the vaccine requirement in which she wrote: "The Holy Spirit, whom [sic] is living inside of me, guides me on a daily basis. . . . After much prayer, I have [a] deep conviction against receiving this vaccine." (Id. at Ex. 31).

C. **Procedural History**

Scafidi initiated this action in state court, asserting claims for religious discrimination in violation of Title VII and the FCRA (Counts I and III) and retaliation in violation of Title VII and the FCRA (Counts II and IV) in her amended complaint. (Doc. # 1-3 at 16-23). Braun removed the case to this Court on December 6, 2022. (Doc. # 1). Braun filed its answer (Doc. # 8), and the case proceeded through discovery.

Now, Braun seeks summary judgment on all claims (Doc. # 60), while Scafidi seeks partial summary judgment on her religious discrimination and failure to accommodate claims. (Doc. # 54). The Motions are fully briefed (Doc. ## 69, 70, 74, 75), and ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the

13

pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex Corp., 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must

be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984)("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . ." (quotation omitted)).

**III.** **Analysis**

**A.** **Braun's Motion**

In her amended complaint, Scafidi raises both religious discrimination/failure to accommodate claims and retaliation claims under Title VII and the FCRA. "[B]ecause the FCRA is based on Title VII, decisions construing Title VII apply to the analysis of FCRA claims." Johnson v. Miami-Dade Cnty., 948 F.3d 1318, 1325 (11th Cir. 2020).

The Court will address the retaliation claims first, and then the religious discrimination/failure to accommodate claims.

### 1. __Retaliation__

Braun argues that summary judgment should be granted on Scafidi's retaliation claims because Scafidi's request for a religious accommodation was not the "but-for" cause of her termination. (Doc. # 60 at 23-25). Rather, "Braun's 'real' reason for separating Scafidi from employment was the fact that she was out of compliance with the vaccine policy." (Id. at 24); see also Lucky v. COBX, Co., No. 22-12514, 2023 WL 3359607, at *3 (E.D. Mich. May 10, 2023) ("It was not Lucky's request for accommodation that resulted in her termination, but her failure to get the COVID-19 vaccine *after her request for accommodation was denied.* Lucky cannot, as a matter of law, establish either of her retaliation claims.").

In her response, Scafidi states that she "agrees to dismiss Counts II and IV of her Amended Complaint for retaliation under Title VII and the FCRA." (Doc. # 70 at 20). Thus, Scafidi has abandoned her Title VII and FCRA retaliation claims. See Edmondson v. Bd. of Trustees of Univ. of Ala., 258 F. App'x 250, 253 (11th Cir. 2007) ("In opposing a motion for summary judgment, a party may not rely on her pleadings to avoid judgment against her. There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary

16

judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); Powell v. Am. Remediation & Env't, Inc., 61 F. Supp. 3d 1244, 1253 n.9 (S.D. Ala. 2014) ("[W]here the non-moving party fails to address a particular claim asserted in the summary judgment motion but has responded to other claims made by the movant, the district court may properly consider the non-movant's default as intentional and therefore consider the claim abandoned."), aff'd, 618 F. App'x 974 (11th Cir. 2015).

Upon review of Braun's arguments and given Scafidi's abandonment of these claims, the Court grants Braun's Motion as to Counts II and IV. Summary judgment in favor of Braun is appropriate on these claims.

## 2.   **Discrimination and Failure to Accommodate**

Counts I and III of the amended complaint assert religious discrimination claims. (Doc. # 1-3 at 18-21). These claims raise both disparate treatment and failure to accommodate theories. Still, the parties agree that the Court may address the theories together. See (Doc. # 69 at 18) (noting that "[t]he Eleventh Circuit's customary approach is to review failure to accommodate and disparate treatment claims together"); see also (Doc. # 74 at 7 n.3) ("Plaintiff

17

agrees that her failure to accommodate and disparate treatment claims should be reviewed together.").

"The term 'religion' in Title VII's prohibition against religious discrimination 'includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observation or practice without undue hardship on the conduct of the employer's business.'" Bailey v. Metro Ambulance Servs., Inc., 992 F.3d 1265, 1275 (11th Cir. 2021) (quoting 42 U.S.C. § 2000e(j)). "To establish a reasonable-accommodation claim of religious disparate treatment, a plaintiff must first set forth a prima facie case by showing that (1) his sincere and bona fide religious belief conflicted with an employment requirement, and (2) his employer took adverse employment action against him because of his inability to comply with the employment requirement or because of the employer's perceived need for his reasonable accommodation." Id. "Once a plaintiff makes out a prima facie case, the burden shifts to the employer to show that it either offered a reasonable accommodation or that it cannot reasonably accommodate the employee's religious practice without undue hardship on its business." Id.

Upon review of Scafidi and Braun's arguments in their respective briefing, the Court determines that both Motions are due to be denied. Genuine disputes of material fact exist as to whether Scafidi held a sincere and bona fide religious belief that conflicted with Braun's vaccine requirement, whether the accommodation Braun offered Scafidi was reasonable, and — if no reasonable accommodation was offered by Braun — whether Braun would have suffered an undue hardship if it gave Scafidi the accommodation she requested.

### a. Religious Beliefs

Again, the first element of a prima facie case is that the plaintiff's sincere and bona fide religious belief conflicted with an employment requirement. Bailey, 992 F.3d at 1275. "To qualify as a 'bona fide' religious belief, the belief must be 'sincerely held' and, 'in the [believer's] own scheme of things, religious.'" Telfair v. Fed. Exp. Corp., 934 F. Supp. 2d 1368, 1382 (S.D. Fla. 2013) (quoting United States v. Seeger, 380 U.S. 163, 185 (1965)), aff'd, 567 F. App'x 681 (11th Cir. 2014). "An employer need not accommodate a 'purely personal preference,' however." Vetter v. Farmland Indus., Inc., 120 F.3d 749, 751 (8th Cir. 1997) (citation omitted); see also Passarella v. Aspirus, Inc., No. 22-CV-287-JDP, 2023 WL 2455681, at *5 (W.D. Wis. Mar. 10, 2023)

19

("The court does not concern itself with the truth or validity of religious belief, nor does it matter whether the belief is part of a mainstream religion or an idiosyncratic one. Nevertheless, the court must distinguish between religious belief and other matters of personal conviction." (citations omitted)). "[T]he United States Supreme Court has explained that although the determination of whether a belief is 'religious' is a delicate question, 'the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests.'" Troulliet v. Gray Media Grp., Inc., No. CV 22-5256, 2023 WL 2894707, at *4 (E.D. La. Apr. 11, 2023) (quoting Wisconsin v. Yoder, 406 U.S. 205, 215–16 (1972)).

As an initial matter, equitable estoppel does not preclude Braun from challenging this element of Scafidi's prima facie case. While Braun seemed to assume that Scafidi's religious beliefs were sincerely held before denying her request for religious accommodation, Braun has not waived its ability to challenge this element in this Court and does not appear to have made any material misrepresentation to Scafidi. Thus, it would not be fair for the Court to prevent Braun from doing so now. See Dawkins v. Fulton Cnty. Gov't,

733 F.3d 1084, 1089 (11th Cir. 2013) ("[T]he elements of federal common law equitable estoppel in this circuit are: '(1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation.'" (citation omitted)).

Thus, the Court will consider Braun's arguments about the first element of Scafidi's prima facie case. Braun argues that "Scafidi's objections were based on her own purely scientific, personal, and medical beliefs about the vaccine" and Scafidi is attempting to "[c]loak[] those beliefs in a religious robe." (Doc. # 60 at 17). In support, Braun points to Scafidi's testimony that her decision was a "matter of conscience" that she reached after weighing the mixed messages she saw about the vaccine. (Scafidi Depo. at 41:25-42:16). Notably, Scafidi admits that she did have concerns over the science and medical safety of the vaccine. (Id. at 23:17-25:25, 44:14-46:13, 50:18-51:5, 132:4-15, 155:10-16).

Basically, as Braun sees it, Scafidi is attempting to convert her personal decision not to get the COVID vaccine for political or safety reasons into a religious decision by invoking the Holy Spirit as "leading" her "conscience." See Finkbeiner v. Geisinger Clinic, 623 F. Supp. 3d 458, 465 (M.D. Pa. 2022) (finding that a sincerely held religious belief was not plausibly pled where the plaintiff, who was Christian and had safety concerns about COVID tests, relied on "her belief that she has a 'God given right to make [her] own choices'" — a belief that is an "isolated moral teaching" and "would amount to 'a blanket privilege' and a 'limitless excuse for avoiding all unwanted . . . obligations'" (citation omitted)), appeal dismissed, No. 22-2714, 2023 WL 6057495 (3d Cir. Sept. 18, 2023).

Indeed, the Braun employees who spoke with Scafidi about her objection to the vaccine believed her objection was scientific or political — not religious. (Cronan Decl. at ¶ 4 & Exs. A-B; Grispo Decl. ¶ 15; Malo Depo. at 83:18-84:3). Thus, Braun contends that Scafidi did not have a sincerely held *religious* belief that conflicted with Braun's vaccine requirement. See Passarella, 2023 WL 2455681, at *5 ("[O]bjections to a COVID-19 vaccination requirement that are purely based on . . . nonreligious concerns (including about

the possible effects of the vaccine), do not qualify as religious beliefs." (citation omitted)); <u>Beickert v. New York City Dep't of Educ.</u>, No. 22-CV-5265(DLI)(VMS), 2023 WL 6214236, at *4 (E.D.N.Y. Sept. 25, 2023) ("[I]t is clear that Kushner's refusal to comply with the Vaccine Mandate actually is based on her concerns about the safety and efficiency of COVID-19 vaccines, which she attempts to categorize as religious convictions by invoking Deuteronomy 4:15 [which states '[y]ou should be very careful to protect your life.']. Her true concerns do not qualify as a proper basis for a religious exemption."); <u>Sherr v. Northport-E. Northport Union Free Sch. Dist.</u>, 672 F. Supp. 81, 94 (E.D.N.Y. 1987) (stating that it must "be demonstrated that the espoused beliefs are sincerely held and that the stated beliefs, even if accurately reflecting plaintiffs' ultimate conclusions about the advisability of inoculation of their children, do in fact stem from religious convictions and have not merely been framed in terms of religious belief so as to gain the legal remedy desired").

For her part, Scafidi emphasizes that she is a practicing Christian. (Scafidi Depo. at 26:4-5, 36:12-15). Part of her beliefs as a Christian is that she must follow her "conscience," which is guided by the Holy Spirit. (<u>Id.</u> at

23

48:13-49:9). While she could not point to a specific Bible verse, Scafidi testified that her beliefs about the Holy Spirit guiding her conscience are "laced throughout all the New Testament." (Id. at 49:2-22). She also points to the religious exemption request form she submitted at her next job as evidence that her opposition to getting the COVID vaccine was religiously based. (Id. at Ex. 31).

Considering the record evidence on the delicate inquiry into sincerity, there is a genuine dispute over whether Scafidi's religious beliefs conflicted with the vaccine requirement, or whether Scafidi's refusal was based on other personal or political beliefs. "Credibility issues such as the sincerity of an employee's religious belief are quintessential fact questions. As such, they ordinarily should be reserved 'for the factfinder at trial, not for the court at summary judgment.'" E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico, 279 F.3d 49, 56 (1st Cir. 2002) (citation omitted). Here, the jury must decide whether Scafidi possessed a sincerely held religious belief that conflicted with Braun's vaccine requirement. See Dixon v. The Hallmark Companies, Inc., 627 F.3d 849, 855 (11th Cir. 2010) ("[T]here is differing testimony as to whether the Dixons held a sincere

religious belief that conflicted with Hallmark's directive to remove their artwork. . . . [T]he parties' conflicting testimony raises a genuine issue of material fact as to the first prong of the failure-to-accommodate analysis. . . . Determining [the Dixons'] credibility on this point is a matter for the jury, not the court.").

### b.   Reasonable Accommodation

Again, "[o]nce a plaintiff makes out a prima facie case, the burden shifts to the employer to show that it either offered a reasonable accommodation or that it cannot reasonably accommodate the employee's religious practice without undue hardship on its business." Bailey, 992 F.3d at 1275. "If an employer establishes that it offered a reasonable accommodation for the employee's religious practice, it is entitled to judgment in its favor. The employer has no further obligation to offer an employee's preferred accommodation or to demonstrate that an employee's preferred accommodation would cause an undue hardship." Id. (citation omitted). That is, an employer is not required to give the reasonable accommodation an employee requests. What matters is that a reasonable accommodation has been offered. See Beadle v. Hillsborough Cnty. Sheriff's Dep't, 29 F.3d 589, 592 (11th Cir. 1994) ("Title VII does not require an employer to give

an employee a choice among several accommodations; nor is the employer required to demonstrate that alternative accommodations proposed by the employee constitute undue hardship. Rather, the inquiry ends when an employer shows that a reasonable accommodation was afforded the employee, regardless of whether that accommodation is one which the employee suggested.").

Here, the parties debate whether the accommodation offered by Braun was reasonable. "A reasonable accommodation eliminates the conflict between employment requirements and religious practices." Bailey, 992 F.3d at 1276 (citation and internal quotation marks omitted). "Although [courts] evaluate offered accommodations on a case-by-case basis, whatever else may qualify, a transfer to a 'comparable position' that removes the conflict between the policy and the religious practice, and reasonably preserves the employee's terms, conditions, or privileges of employment, satisfies the reasonable-accommodation requirement." Id. (citations omitted).

Braun highlights that it offered the accommodation of "reassignment to a non-customer-facing position not subject to the vaccine requirement." (Doc. # 60 at 18). Indeed, the FAQ page sent with Braun's announcement of the vaccine

requirement informed customer-facing employees like Scafidi that they could "apply for other non-customer-facing opportunities in accordance with the job posting policy." (Donigan Depo. at Ex. E); see Walker v. Indian River Transp. Co., 741 F. App'x 740, 747 (11th Cir. 2018) ("Walker contends that Indian River failed to reasonably accommodate him because the routes he was offered after his request paid less than the milk route. But an accommodation may be reasonable even if it adversely impacts the employee to some extent."). Scafidi was aware of her ability to apply for a non-customer-facing position with Braun, but never applied for such a position. (Scafidi Depo. at 101:17-102:17, 103:18-24); see Bartholomew v. Washington, No. 3:23-CV-05209-DGE, 2023 WL 6471627, at *4 (W.D. Wash. Sept. 21, 2023) ("Despite receiving this offer of potential reassignment, Plaintiff failed to submit a resume by the deadline specified in the religious accommodation notice and instead sought to negotiate with HR so that he could continue to work remotely. Based on these facts, the Court cannot find that Plaintiff has adequately stated a failure to accommodate claim under Title VII.").

But Scafidi notes that no non-customer-facing positions were available in Tampa, so she would have had to relocate for a new position. (Scafidi Depo. at 103:13-21; Grispo Decl.

¶ 14). There was also testimony from Braun's corporate representative, Vestal, that no positions were available in Tampa and she was not aware if any of the open positions paid a salary close to what Scafidi had been earning in her sales position with Braun. (Vestal Depo. at 38:2-25). Rather, the closest available non-customer-facing positions were in Daytona Beach, Florida. (Id. at 38:5-12). Vestal was also unaware if Scafidi was qualified for any of the available positions. (Id. at 40:5-17). Thus, there is a dispute over whether a "comparable position" was available to Scafidi for reassignment.

"Determining what is reasonable is a fact-specific determination that must be made on a case-by-case basis." Tabura v. Kellogg USA, 880 F.3d 544, 551 (10th Cir. 2018). Because of the genuine dispute about the reasonableness of reassignment here, this issue cannot be decided on summary judgment. Rather, the jury should make the reasonableness determination. See E.E.O.C. v. Universal Mfg. Corp., 914 F.2d 71, 73 (5th Cir. 1990) ("We need not embark on a long discussion of what is or is not 'reasonable' accommodation. Ordinarily, questions of reasonableness are best left to the fact finder."); E.E.O.C. v. Robert Bosch Corp., 169 F. App'x 942, 944 (6th Cir. 2006) ("The reasonableness of an employer's

attempt at accommodation must be determined on a case-by-case basis and is generally a question of fact for the jury, rather than a question of law for the court.").

### c.   Undue Hardship

Finally, Braun argues that, assuming Braun did not offer Scafidi a reasonable accommodation, "providing Scafidi with her requested accommodation would have imposed an undue burden on [] Braun." (Doc. # 60 at 21).

While this case was pending, the Supreme Court decided Groff v. DeJoy, 600 U.S. 447 (2023). The Supreme Court clarified "that showing 'more than a *de minimis* cost,' as that phrase is used in common parlance, does not suffice to establish 'undue hardship' under Title VII." Id. at 468. Rather, "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." Id.; see also Id. at 470 ("[I]t is enough to say that an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business."). The Court is mindful that "[w]hether an employer will incur an undue hardship is a fact question that turns on 'the particular factual context of each case.'" Tabura, 880 F.3d at 558 (citations omitted).

29

A genuine dispute of material fact exists as to whether Braun would have suffered an undue hardship if it had allowed Scafidi to stay in her customer-facing position without getting vaccinated. Braun has provided evidence that there would be increased costs and administrative difficulties if Scafidi, a salesperson unlikely to receive exemptions from each of the hospitals in her territory to any vaccine requirements, was allowed to continue working unvaccinated. These difficulties would have related to tracking the patchwork of exemptions and vaccination policies across the over-one-hundred hospitals Scafidi covered and reconfiguring other salespeople's territories to cover hospitals that Scafidi would not be allowed to enter unvaccinated. (Grispo Decl. at ¶¶ 11-13). Indeed, as pointed out by Scafidi's supervisor Malo, such reconfiguring of territories has in the past taken Braun eighteen months and involves work by compensation analysts and involvement of various Braun executives. (Malo Depo. at 85:9-86:22, 87:15-88:6).

But, on the other hand, there is testimony that Braun did not do any analysis to determine the costs of reconfiguring Scafidi's territory if any hospitals denied her admission. (Vestal Depo. at 126:23-127:2). And, indeed, Braun has not presented any estimate of the costs it would have

incurred if it had allowed Scafidi to retain her position without getting vaccinated. Furthermore, it does not appear that any of the hospital systems in Scafidi's territory had denied her access or denied her requests for a religious exemption submitted through the hospitals' vendor credentialing systems at the time of her termination.

Thus, summary judgment is inappropriate on this point. See Crider v. Univ. of Tennessee, Knoxville, 492 F. App'x 609, 615 (6th Cir. 2012) ("Because a genuine issue of material fact exists as to the possible hardship UTK might suffer by accommodating Crider's religious beliefs, summary judgment was inappropriate.").

### B.   **Scafidi's Motion**

Scafidi seeks summary judgment in her favor on her religious discrimination/failure to accommodate claims. This Motion is denied for the same reason Braun's Motion is denied as to these claims. Genuine disputes of material fact exist as to whether Scafidi held a sincere and bona fide religious belief that conflicted with Braun's vaccine requirement, whether the accommodation Braun offered Scafidi was reasonable, and — if no reasonable accommodation was offered by Braun — whether Braun would have suffered an undue hardship if it gave Scafidi the accommodation she requested.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Plaintiff Courtney Scafidi's Motion for Partial Summary Judgment (Doc. # 54) is **DENIED.**

(2)  Defendant B. Braun Medical, Inc.'s Motion for Summary Judgment (Doc. # 60) is **GRANTED** in part and **DENIED** in part.

(3)  Summary judgment is granted in favor of Defendant on Counts II and IV but denied as to Counts I and III. The case will proceed to trial on Counts I and III.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 17th day of January, 2024.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE